Next case call for oral argument is Short v. Coonce, counsel. Whenever you're ready, counsel. May it please the court, Mr. McIntyre. I'm Richard Kruger. I'm from Tropas, and I represent Stephen Short as the plaintiff on this case. This is an adverse possession case. Steve Short purchased this land in 1988, and he claimed adverse possession up to an existing fence. And the testimony in this case is that fence had existed continually since 1938. Four witnesses were called by the plaintiff. The testimony of the plaintiffs was basically unrebutted, unimpeached, and uncontradicted. The trial court ruled for the defendants, and Stephen Short asserts that errors were made in law and fact in the case. What I'd like to do today would be to first cover the errors of law, and I believe there's four significant errors of law, and then discuss that the plaintiff did prove each and every element of adverse possession and review the testimony in that law. There's other matters in the brief, but I believe that they're well covered. Those are the ones I'd like to address. The facts in this case I believe are best shown in the copy of the survey and an aerial photo that's in the appendix to our brief. It's on A7 and A8. These are actually photocopies of exhibits, plaintiff's exhibits. On A7 is Plaintiff's Exhibit 1. The areas in yellow are the areas in dispute. Mr. Short, the plaintiff, owns to the west and north of that line. That would be on the left-hand side of the page, and Defendant Kuntz would own to the east and south. On A8, which is an aerial photo, which the surveyor in this case has imposed the fence lines and section lines on, and the handwriting that's there with the notations were made by Plaintiff Stephen Short during the testimony, showing the various uses that occurred within the disputed area. You see references to what those various uses are. You can see that the uses were quite extensive. Four witnesses testified for the plaintiff. The defendants did not testify. The only evidence presented by the defendant was to call the plaintiff as an adverse witness and ask seven questions regarding his residence. The areas of law that were made plain to submit by the trial court, and these are the four most serious, first would be the trial court, and this is in paragraph 8 of the judgment, which is the most extensive part of the judgment. I think it takes anywhere from a third to a half of the judgment. In that, the trial court at least five times states that, about the considerations and the feelings of the defendant, what the defendant's feelings and considerations were, that the plaintiff must prove that the defendant thought the fence or felt that the fence was the boundary line, and similar statements were made. The law is that the feelings and considerations of the defendant in adverse possession really don't count. The defendant could think that his fence was the great wall of China, and it wouldn't make a darn bit of difference. The important thing is the actions of the plaintiff. Did the actions of the plaintiff meet adverse possession? And that's what matters, and the trial court got it wrong, and if you read paragraph 8 of the judgment, you can see that very clearly. Do we have to consider the actions of the defendant also? Excuse me? Do we have to consider the actions of the defendant also? You know, like as far as allegations that the defendant built a new fence or cleared property on the other side of the fence, do we consider that too, or does the trial court consider that? If it went, for example, to the issue of exclusive possession, if he had crossed the fence, say, and done something over there, that would be an action that could be considered, but not his feelings and thoughts. It would be his actions, and there possibly could be some other elements in there that that might play out too, but the primary focus would be on the plaintiff and the plaintiff's actions in adverse possession. Okay. The second serious error is that the court speculates as to what the feelings and considerations are, and that's done again in paragraph 8, and that's kind of remarkable to know that the court assumes that the defendant thinks a certain way because the defendant never testified. I don't know how the court was able to presume his feelings and considerations. In the testimony, there was some testimony that directly contradicts where the surveyor, Mitch Garrison, when he talked to the defendant, the defendant considered the line of occupation up to the fence line, directly contradicting the trial court. The third serious error in law is that in the decision of the trial court, and you see this in paragraphs 6, 7, and 9, the court will take a particular, and there's like ten uses that the plaintiff did in this property. He had a roadway, mowing, clearing, planting trees, hunting permanent temporary deer stands, planting the food plots. There were just a lot of things that the plaintiff did in this case that the record shows, but the trial court would take each element, for example, honey, and would say honey in and of itself doesn't establish adverse possession, and would do the same with the planting of these trees, that that wasn't for the total 20-year period. He considered each element separately and determined that that did not meet that adverse possession. It's our position in the plaintiff that you consider the totality of the circumstances, the totality of the uses. Did the totality of the uses extend for the full 20 years? Were the totality of the uses enough to be visible and be actual? There was about 200 or 300 trees that were planted, I think. I believe so, Your Honor. And can you give me a time frame of when these were planted? I believe that they were started planting in the early 1990s. They were planted all within a year. They were planted in rows and had white stakes, and of course they existed from that time on. Okay, so they've been planted for the last 15 years or so. Yeah, the plaintiff has owned this land since 1988, so, I mean, he meets the 20 years. But the pine trees weren't planted when they weren't there all during the full 20 years, but it was, again, the totality of the use. Does the record show what precipitated this lawsuit? I mean, right at almost the 20-year period of time, was there any certain incident that occurred that made him contact you? I don't know that it's in the record, Your Honor. There's five acres here, and, of course, you can see from the record there was surveying going on. But there's no significant thing in the record that shows what prompted the surveys? There wasn't any argument or shout-outs or anything like that. It was just, no, I believe that's outside that. The court also took these four uses and considered each one separately, but they ignored many of the other uses, probably the most significant would be this roadway that the plaintiff uses to gain access to the rear portion of his land. And it's shown that that roadway is used several times a week. Equipment and everything is on that roadway, the clearing, the mowing. All these were ignored by the court in his order. And, again, the court takes that, considers each use separately. The fourth series here has to do with what I call the spraying problem. The testimony was that the defendant used herbicide and sprayed it along the fence row. I think there was, since he didn't testify, there was testimony that some of it drifted or went over onto the other side of the fence row. We don't know whether that was intentional or whether that was just a drift, which is a common problem when you use herbicide with the wind. We don't know how skillful the defendant was. But anyway, the court indicated that that spraying, which ended up on the other side of the fence line, was possession by the defendant. So you have here kind of a novel situation. You don't even have to cross on the other side of the fence to be in possession. You don't even have to come on to the property for the defendant to be in possession. Clearly, it's our position that that is not the law. Did he build the new fence, the defendant? Yes, sir. And was that? That was done shortly after Mr. Short, I think, had acquired the property, I want to say in one or two years. And was that on the disputed property? It would be the fence that was built would be at the edge of the disputed property. We do submit that the plaintiff asserted control right up to the fence, Your Honor. The new fence, too? Well, yes. But the new fence, the testimony shows, was put exactly where the old fence was. Okay. So it wasn't built on what the plaintiff would consider his property? No, sir. Okay. No. When the plaintiff bought the property, there was an existing fence. Right. And then that fence was taken out, and the fence was put in the exact location. And that's shown, I think, very clearly by the aerial photos that go all the way back to 1938. And you can impose that, plus the evidence of the old wire, trees, other evidence of the old fence, and testimony that it was put back in the same location. Shifting here a little bit into the proof of the elements of adverse possession, the record here is clear and the testimony is clear that the plaintiff proved all these elements of adverse possession. And that is in the record. The definite track, the track goes up to the fence line. That was the possession line. All four witnesses testified that. Plus there was testimony that Mr. Koonce had said that was the line of possession. There was actual possession and occupation for over 21 years of this property. What's in dispute here is 5.19 acres. I don't know if I said that or not. One of the witnesses characterized it as deer hunting ground, not really a woods. It's kind of, you know, it's next to a fence and it has trees planted in it, much of which the plaintiff did. The uses, there were nine uses in this 5.19 acre area. The roadway, which is the only access to the rear portion of the farm, Plains Farm. The planting of the pine trees, this was done in the 90s. There were three rows deep, two to three hundred trees, two areas with white stakes. Cleaning and clearing up to the fence line, this was done by Mr. Short immediately after he bought the land and continued on. Hunting by Mr. Short and the hunters that he leased to. Planting the food plots, what Mr. Short would do there would plant non-native species like turnips and red clover and grass. It would stand out in this area. Planted it and mowed up the fence line and cut firewood. He had deer stands, both permanent and temporary. Leased land to hunters. There was just a lot of use in this. That was visible, notorious. It was calculated to give notice. Continuous over the 20-year period. It meant the element of hostile, which really doesn't necessarily mean ill will. It's just assertion of ownership incompatible with all others. Used to the exclusion of all others. It was exclusive. No one really could enter this. Defendant couldn't because of the fence. There was testimony that no one else used it other than plaintiff and his invitees. There was possession with a claim of ownership, which is in the law as continued acts of ownership. Using and controlling, that was there. No testimony of any permissive use. Testimony was that the plaintiff never asked for permission. In short, this testimony was, again, unrebutted, unimpeached, uncontradicted. And we would submit that the plaintiffs proved the case. And we would ask that the court reverse the top order in our judgment for the plaintiff or the attorney to reverse and remand with instructions. Thank you, Counsel. Thank you. Counsel? May it please the Court. Good morning, Your Honors. My name is Alan McIntyre. I'm from Viana. I represent the defendants, Doyle and Shirley Coons. First of all, I'd like to make it clear this fence was not constructed by the plaintiff in this case. This fence was constructed by the defendants. If a property owner constructs a fence within the confines and the boundaries of his own property, does he then lose title to all the property that falls outside of that fence? We're talking over five acres here. He did not construct the fence. And there is a permissive influence that I cited in my brief under the Welliver case, State of Welliver v. Albert. And in this case, you had wild, undeveloped land, which is what we have here. It's hunting property. Morse Mott testified under oath that the property was, some of it was good woods, some of it was crappy woods, and some of it wasn't really even woods. It was just deer hunting ground. There were numerous photos that were submitted by the plaintiff in this case. And if you actually review these exhibits, this is not cleared ground. The elements of adverse possession, both of us cited those in our brief, and there's really no need to keep going over those. But as Justice Palmer indicated and as he's pointed out, these pine trees are not 20 years old. The testimony was that they were planted in the early 90s. Cutting dead wood, which is what the testimony was, we're not talking, there was never any testimony by the plaintiff that he went out and he cut down trees and then cut them up and hauled them off the firewood. That never occurred. His testimony was he only cut dead trees that had fallen onto the ground. Was your client aware that the plaintiff had planted all these trees back in the early 90s? I think it's clear when you can see them. You can see these. There was nothing in the record regarding his awareness of them, Your Honor. He doesn't claim that he was not aware of them. No, he was not. He just thought that the plaintiff was being overly generous to plant trees on somebody else's property? That's a good point. I probably would have done something about it if he did not. But there's nothing in the record to show that he was inquisitive enough to inquire to his neighbor, why are you planting 200 or 300 trees on my property? No, sir. But, you know, not to be flippant, the Arbor Day Foundation plants trees. But when they plant a tree, they don't then acquire the property that surrounds the tree. And in order for it to be adverse possession, you have to possess for 20 years. Let me ask you a question about the fence, because the fence is usually the biggest factor in adverse possession. Why would he, your client, the defendant owner, put a fence five acres short of his own property? There was testimony, number one, on the survey that is marked as A7. There was testimony on this C to D line that there is a deep gully traversing most of the way through that segment of property. There was also testimony, and it was actually stated by the trial court in its judgment, that there's a pasture, a fence, and then woods. So a legitimate assumption could be that you've got pasture land and then you've got woodland. You can't have cattle grazing in the woods. You have to have a pasture. And I think that one thing that was basically argued by the plaintiff in this case is he says that the trial court did not consider the totality of the circumstances. And I think it also can be said that the argument is, in a nutshell, the use of property can change as long as you have uninterrupted, clear, unequivocal evidence of possession. If I put my cattle on my neighbor's pasture and let them graze out there for five years uninterrupted, and then I immediately removed the cattle and built a house on the same property where the cattle was grazing for 15 years, then at the end of that 20-year period of time, I acquire the property. That's adverse possession. However, what if I only graze these cattle at night where they can't be seen by the property? We're talking hunting. One of the major uses that this plaintiff claims that gives him the right to possess and own this property is the fact that he hunted. His own testimony. I was camouflaged. I hoped I wouldn't be seen. Someone who is invisible and his buddies that he increases the property to that are invisible, that are wearing camouflage, that are hunting, they don't want to be seen. They don't want to be seen by other hunters. They don't want to be seen by the adjacent property owners. And they do not want to be seen by the deer. The plaintiff has alleged, the way I count, five basic indications of use of the property. That he hunted, as you pointed out, he cleared the fence line, he planted food plots, planted the pine trees, and he used and maintained a roadway. Was your client aware of all of those alleged uses of the property? I cannot say that he was aware of the food plots for sure. Because the testimony of Mr. Short was that he used one weekend. It took him one weekend to plant a food plot. And then he just left it alone. I specifically asked him at the trial, did he harvest what he planted? And the answer was no. What about the other things? Was he aware that there was hunting being done on the property? Well, there was a deer stand that was kind of obvious on point number. . . There was one permanent deer stand that was indicated on the record. Which would be an indication of hunting? Yes, it would be an indication of hunting, yes. And he was aware of that? Yes, but it was a broken down deer stand according to Mr. Short. So it could have been there for 20 years? Yes, or it could have been there for 50. We don't know. The other ones were portable deer stands. And there was testimony regarding portable deer stands. That he would put them on a trail and that he would move them the next year after the hunting season was over. And I questioned him about the deer hunting on the property. And as the court probably is aware, I specifically asked him this question. Deer hunting, as far as shotgun hunting, is seven days in the state of Illinois. Seven days. The actual bow hunting season stretches from October to January. It's not continuous hunting. It's not continuous open and notorious hunting. The mowing. The testimony from Mr. Short was he mowed that property close to the fence two to three times a year. Bi-annual or at the most, tri-annual mowings up next to the fence line. Not the whole 5.19 acres next to the fence line. Guess when he stopped? He stopped the mowing when my client started spraying across the fence line. Now Mr. Gruber just indicated to me that it could have been a drift. And he argued that in his brief. If it was a drift, it was a very good drift that caused Mr. Short to stop mowing in 2007 at the absolute latest. A period of, at the max, 19 years. And he had the Wabalawi trees were not planted until the early 90s. The roadway. I believe that, I even concede the fact that the roadway is used regularly, visibly, openly, and notoriously by Mr. Short. It goes across that property. I admit that. However, you use a road and you win five and a fifth acres. Mr. Short did not pray for any sort of a prescriptive easement in this instance. He not only apparently wants the roadway, he wants all of the property. And the use of this roadway does not gain him that. In short, in sum, the 20 year use. None of the roadway is on this five point. Yes, some of it crosses it, your honor, it does. Some of it is on it. Yes, some of it does cross it. There was testimony to that fact. We haven't had a chance to look at the record yet. It doesn't go all the way down the property. Okay, it cuts across the property. So he actually, assuming that there is a prescriptive easement, which has not been sought for or has not been declared by any court, but assuming that there is one, that easement cuts right across this 5.19 acres. The rest of the roadway is on Plaintiff's property, on Short's property? Yes. Yes, it goes across my client's property and down into Mr. Short's property. Does that answer your question? Well, no, not really. The roadway, the five point but some odd acres of land, contains, the roadway goes across part of that. Yes. The rest of the roadway, is any of the remainder of the roadway on your client's property? I believe it is. Other than on the five point some odd acres? Within the fence is what you're asking? Well, I'm saying if there's going to be another lawsuit or an easement later on, because use of this property, use of the roadway, it may be separate than the five point some odd acres of land. Right, and that's my argument, that it is totally separate, because when you use a roadway or a path or a trail, you don't acquire all of the surrounding property that adjoins it. You just acquire a prescriptive easement over the road. As far as the errors that were complained of by the trial court, the feelings of the defendant, it's true there was no direct testimony from my clients regarding what their feelings were. However, the court can infer the feelings of a defendant based on what that person's acts are. And he, in fact, Judge Jackson, did that in his order itself. Also, the fact that the defendant did not consider the fence a boundary, did not complain about the fence or the plaintiff did not complain about the fence or the wheat killer, it tends to show the plaintiff's lack of hostile and notorious possession, i.e., I'm possessing this property, but I'm going to keep it a secret. I'm not going to spill the beans to the adjacent property owner by letting him in on what I'm doing. And that in and of itself tends to prove that the possession was not open, notorious, and visible. And for certain, it was not for 20 years. Clearing out a fence road and then planting trees. The planting of the trees is an issue, but they haven't been there for 20 years. So this area that surrounds the trees, had those trees been there for 20 years, we'd have a whole different case than what we have now. Your client didn't testify, so we don't know what he thought was permissive or what he just thought was adverse. That's correct. Correct? Yes. If he had testified that he was aware that it's permissive, he definitely would win there, correct? Yes. Why didn't he testify? Is there a reason? I did not believe that the plaintiff had shown his case because I do not think, and I think the law is with me on this, that hunting, biannual mowings, planting of food plots, I don't think any of that even can count toward the 20-year requirement of open and notorious possession. The hunting certainly can't. You can't see the people. You can't see them when they're out there. The planting of the food plots is somebody plants clover on one weekend and then goes away and doesn't mess with it again. How is that open, hostile possession? And it's certainly not continuous if it's only there for three months out of the year. The biannual mowings, that's not continuous either. There is a presumption, as cited in my brief, about the use of wild, undeveloped land, i.e. woods, being presumptively permissive. And I really urge the court to really review the estate of Welliver v. Albert because I really believe that that case is on point with this one. And Welliver, did the owner testify that he gave permissive use? He did testify that he was aware of the annual motorcycle club that used the property. He did testify to that. He did testify he was aware there was hunting going on. But it's not whether the adjacent property owner permitted it. It's whether or not the plaintiff overcame the presumption of permissiveness. In that case like this one, the plaintiff never fenced in the property. The plaintiff in this case never fenced that property in. The client fenced the property in. The court's speculation, I submit to you, is not an actual speculation, but is actually a reasonable inference to be drawn from the evidence. Does Jackson have to do a day-and-a-half-long bench trial and make this ruling? If the court does find that Judge Jackson's ruling as far as what the appellant attorney stated was, the feelings were unlawful for him to consider that because he didn't testify, I submit to you that even if you throw that one part out, this judgment should still be sustained. Someone should not acquire their neighbor's property when the neighbor can't see them out there hunting, whenever he can't see them out there mowing but once or twice a year. It's not enough. This is a big deal for someone to try to take six acres with saying that they've testified. It's not enough under Illinois law. The messenger versus Edgar, which I cited in my brief, I said if the court disagrees with a reason that the trial could be gave but there's sufficient other reasons to sustain the judgment, you may do that as well. And I urge you to do that as well if you find that Judge Jackson was mistaken in what some of his legal reasoning was. Because there's enough here based on what I have indicated to you. The 20-year requirement for adverse possession has not been met. There has been no visible, notorious, and exclusive possession of the Coons' property for a period of 20 years. And I ask you to sustain the trial court's judgment. Are there any other questions from the panel? I don't believe there are. Thank you, counsel. Counsel? Let me clear up some of these points that were raised. The question was asked why anyone would build a fence that far off the boundary line to exclude 5.19 acres. I think if you look at the area, the distances, I mean it extends over a large area north and south. And the distances that's being claimed I think at most are 100 feet at certain points, but they all add up to 5.9. I think that's part of the answer. And the other part is that it was put back, this fence was put back in exactly the same position as the previous fence. And that's why he put the fence where it was. I would assume, again, that's going outside the record and the defendant did not testify. As to the question on the roadway, if you look at Exhibit 6, which is on A8, you see that roadway drawn in. And the roadway is on plaintiff's land or in the disputed area. You can see it's got a line that extends from a clearing going down to another clearing. And you can see it's a curving road and it has written on the side, roadway. Can I go back to the fence a minute? Sure. The owner built it and he built it not on his property, short of his property. Who maintained it? Is there evidence about who maintained the fence? No, sir. No, I think it's totally outside the record. Of course, I think the important thing is it doesn't matter. We're not claiming the fence and the land it's on. We're claiming the area up to the fence. And I don't think it really matters who built the fence. It's the actions of the plaintiff in using the property up to the fence line. That area of spraying, I think the record will show that that was just on one portion of the real estate. You see from the aerial photo that the cleared areas in some areas extend right up to the fence. I think between points, I believe they're marked B and D. I think the record will show that that's where Mr. Short stopped mowing. The argument about the presumption when you have, I think Mr. McIntyre characterized it as wild land. There are cases which are cited in our briefing on pages 47 through 48. There are several cases that say the adverse possession is determined by the nature and condition of the land. In other words, the use goes with the type of land that it is. And if you have rough land, you may not need to have quite as extensive use as you would, say, in a culvert where you're row cropping. And those are all cited on the case. This presumption of permissive use from vacant land, I believe it's what Mr. McIntyre... There are cases like that in Illinois that we would submit, and it's in our brief. The granddaddy of all those cases is a Parker v. Rosenberg. It's a 1925 Illinois Supreme Court decision. And that decision uses the word vacant, but also it uses the words enclosed or unenclosed. I'm sorry, vacant, unenclosed land. The later cases drop the unenclosed. I've argued this point before. This would be a good area to clarify because that unenclosed makes all the difference in the world. And those later public court cases ignore that language from Parker. But this is enclosed property. The defendant wants you to consider the Will Lieber case. The Will Lieber case involves the recreation of trails. Totally different, distinct. In Will Lieber, the land was not enclosed. There were no improvements. Very different from this case. And the maintenance consists of a snipping vegetation that overgrown over these narrow trails. Unless there's a question, I do not have anything to argue. I don't believe there are. Thank you. Thank you very much. We appreciate the briefs and arguments from counsel to take the case under advisement.